**In re MUMA SERVICES, INC., et al., f/k/a Murphy Marine Services, Inc., Debtors.**

**Nos. 01–926 (MFW) to 01–950 (MFW).**

United States Bankruptcy Court, D. Delaware.

Nov. 27, 2002.

**584**

Laura Davis Jones, Christopher J. Lhulier, Pachulski, Stang, Ziehl, Young & Jones, Wilmington, DE, Richard L. Epling, Pillsbury Winthrop LLP, New York City, for debtors.

Teresa D. Currier, Eric Lopez Schnabel, Klett, Rooney, Lieber & Schorling, Wilmington, DE, Michael B. Fisco, Anne F. Larsen, Faegre & Benson LLP, Minneapolis, MN, for Official Committee of Unsecured Creditors.

Arthur L. Dent, Erica L. Niezgoda, Potter, Anderson & Corroon LLP, Wilmington, DE, for Faegre & Benson, LLP.

Francis A. Monaco, Jr., Walsh, Monzack & Monaco, P.A., Wilmington, DE, Joseph L. Schwartz, Curtis M. Plaza, Ryker, Danzig, Scherer, Hyland & Perretti, LLP, Morristown, NJ, for The Bank of New York, as Indenture Trustee.

Frank J. Perch, III, Wilmington, DE, Office of the United States Trustee.

## OPINION [1]

MARY F. WALRATH, Bankruptcy Judge.

Before the Court is the Motion of the Bank of New York, as indenture trustee, ("BONY") to Disqualify Faegre & Benson LLP ("Faegre") from serving as counsel to the Official Unsecured Creditors' Committee ("the Committee"). The Motion is opposed by the Committee and Faegre. For

---

**1.** This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

the reasons that follow, the Motion will be denied.

## I.  *FACTUAL BACKGROUND*

On or about July 20, 2000, BONY retained Faegre's Denver office to monitor proceedings in the case of *In re American Housing Foundation I, Inc.* ("American Housing"), pending in the United States Bankruptcy Court for the District of Colorado.  BONY was the indenture trustee for bonds issued by American Housing pre-petition.  The bondholders were represented by the firm of Stroock & Stroock & Lavan LLP ("Stroock") and by local counsel.  While the interest of the bondholders was also represented by counsel for the Committee in that case, BONY retained Faegre to represent it as indenture trustee.

In connection with its representation of BONY in the American Housing proceedings, Faegre billed approximately 25 hours, with all work being performed by Michael Pankow ("Pankow"), a bankruptcy partner in Faegre's Denver office.  Pankow reviewed the first-day papers and attended the first-day hearing on July 21, 2000.  Thereafter, Pankow's role was to review certain pleadings and consult with BONY, as requested, about the American Housing proceedings.[2]

On March 30, 2001, the Committee appointed in the instant case approached Michael Fisco ("Fisco"), a partner in Faegre's Minneapolis office, seeking to retain his firm as Committee counsel.  Fisco performed a conflicts check, which revealed Faegre's representation of BONY in the American Housing matter.  Another partner in the Minneapolis office, Michael Stewart, then contacted Pankow regarding Faegre's representation of BONY.  Pankow advised him of the nature of Faegre's representation.

Shortly thereafter, Pankow contacted Irene Siegel ("Siegel"), a BONY vice-president and Pankow's usual contact person.  Pankow testified that he informed Siegel that Faegre's representation of the Committee could be considered adverse to BONY, which is serving as an indenture trustee in this case as well.  He further testified that he expressed his hope, based on the limited nature of Faegre's involvement in American Housing, his non-involvement in the instant case, and the absence of a connection between the two matters, that BONY would not object to Faegre representing the Committee.  According to Pankow's testimony, Siegel responded that she had no objection.  BONY's consent was never reduced to writing; however, Pankow testified that he believed he had obtained a waiver.[3]  BONY's witnesses testified that they never granted a waiver of the conflict, and stated that it was not BONY's policy to do so.

Pankow reported to his partners in Minneapolis that he had "cleared" any potential conflict by obtaining a waiver from BONY. Therefore, on April 24, 2001, Fisco filed an Affidavit pursuant to Federal Rule of Bankruptcy Procedure 2014 in support of the Application of the Committee to retain Faegre.  That affidavit disclosed that Faegre had represented or currently represented several entities that were creditors of the Debtor in unrelated matters.  BONY was listed as one of those creditors and was served with a copy of the affidavit.  BONY did not object to Faegre being retained as Committee coun-

---

2.  Faegre did file a Proof of Claim on behalf of BONY, but that was prepared by Stroock and directed that any notices to BONY be sent to Stroock.

3.  Pankow testified that, while not his general practice, it was not the first time he had obtained a conflict of interest waiver without having it reduced to writing.

sel in this case. On June 12, 2001, an Order was entered authorizing the Committee to employ Faegre, retroactive to March 30, 2001.

Meanwhile, back in Denver, Pankow had decided in early May to leave Faegre by the end of that month. He met with the senior partners in his office and it was decided, based on the size of the American Housing file and the fact that Pankow was the only attorney who had worked on it, that Pankow would recommend to BONY that the file move to his new firm. Pankow testified that he discussed his upcoming move with Siegel and that she was "unequivocal and unconditional" in her request that the file move with him. He was instructed by Siegel to contact Suzanne Andrews ("Andrews"), senior counsel in BONY's legal department, to make arrangements for the file transfer. He testified that Siegel indicated that Andrews was "famously hard to reach." Pankow made several attempts to contact Andrews, without success. Pankow testified that he then waited for her to contact him, though it appears she never did. Nevertheless, Pankow informed his partners in Denver and Minneapolis that the American Housing file was moving with him to his new firm. Thus, by the beginning of June 2001, Faegre believed that the American Housing file had moved with Pankow to his new firm and that BONY was no longer a client of the firm.

Upon being retained to represent the Committee, Faegre began investigating certain rights, liens, and interests granted to BONY as indenture trustee for holders of certain industrial development bonds. On July 26, 2001, the Committee moved for an extension of time within which to challenge those liens and interests. Ultimately, on October 15, 2001, the Committee commenced adversary proceedings against multiple bondholders, challenging various aspects of the claims and liens of the bondholders. Each of the complaints named BONY as defendant on behalf of the bondholders.

In early November 2001, Siegel, on behalf of BONY, contacted Faegre's Denver office and asked for Pankow. This apparently was the first contact between BONY and the Denver office since Pankow had left. Faegre's managing partner in the Denver office, Dirk de Roos ("de Roos") took the call from Siegel and informed her that Pankow had left the firm and offered to give her Pankow's new phone number. Instead of taking Pankow's new phone number, Siegel stated that there was an urgent matter in the American Housing case that BONY wanted Faegre's Denver office to handle, but that there was a conflict that needed to be resolved.

Faegre then discovered that the American Housing file had never been transferred to Pankow's new office and that a written waiver with respect to Faegre serving as Committee counsel in this case was never obtained. Though the conflict issue raised by Siegel in her November call had not been resolved, Faegre agreed to handle the emergency matter (over the Thanksgiving weekend), which involved reviewing certain real estate documents relating to a sale of property in the American Housing matter. It was agreed by the parties that that work would have no effect on the resolution of the conflict issue.

Thereafter, letters and phone calls between Faegre and BONY were exchanged between December 2001 and February 2002 in an attempt to resolve the conflict. No resolution was reached as BONY refused to grant Faegre a waiver and Faegre refused to do any additional work on the American Housing matter without a waiver and refused to withdraw from serving as Committee counsel in this case. By the end of February 2002, Faegre re-

turned the American Housing file to BONY and terminated its representation of BONY. On March 25, 2002, BONY filed the instant Motion seeking an Order disqualifying Faegre from representing the Committee in the instant chapter 11 case and in the adversary proceeding commenced by the Committee against BONY. The Committee and Faegre both opposed that Motion. A hearing was held on April 22, 2002, and post-trial briefs were filed on June 14, 2002.

## II. JURISDICTION

This Court has core jurisdiction over this matter pursuant to 28 U.S.C. § 157(b)(2)(A).

## III. DISCUSSION

■■■ A court's power to disqualify an attorney "stems from the inherent authority to supervise the attorneys appearing before it." *Kaiser Group Int'l, Inc. v. Nova Hut (In re Kaiser Group Int'l)*, 272 B.R. 846, 850 (Bankr.D.Del.2002). The exercise of that authority is within the court's discretion. *Id. See also U.S. v. Miller*, 624 F.2d 1198, 1201 (3d Cir.1980). The court should disqualify an attorney only when it determines, on the facts of the particular case, that disqualification is an appropriate means of enforcing the applicable disciplinary rule. *Miller*, 624 F.2d at 1201. Disqualification is never automatic. *Id.* Rather, the court is to "consider the ends that the disciplinary rule is designed to serve and any countervailing policies." *Id.*

### A. Rule 1.7 of the Model Rules of Professional Conduct

Rule 1000–1 of the Local Rules of Bankruptcy Procedure for this District provides that the Local Rules of the District Court, to the extent they are not inconsistent, shall apply. Del.Bankr.LR 1000–1. Local Rule 83.6 of the District Court provides that attorneys practicing before the Court are governed by the Model Rules of Professional Conduct of the American Bar Association. D.Del.LR 83.6(d)(2). *See also Elonex I.P. Holdings, Ltd. v. Apple Computer, Inc.*, 142 F.Supp.2d 579, 582 (D.Del.2001).

BONY asserts that Faegre should be disqualified under Rule 1.7 because, while representing it, Faegre undertook a representation directly adverse to it. Rule 1.7 of the Model Rules of Professional Conduct states the following:

> Conflict of Interest: General Rule: (a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless: (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and (2) each client consents after consultation. (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyers' responsibilities to another client or to a third person, or by the lawyer's own interests, unless: (1) the lawyer reasonably believes the representation will not be adversely affected; and (2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

Model Rules of Prof'l Conduct R. 1.7.

We conclude that Rule 1.7(a) is not applicable here, because Faegre's representation of the Committee was not directly adverse to BONY from the outset. In fact, as a creditor, BONY's interests were aligned with the Committee when Faegre was initially retained. It was not until later, when the Committee's investigation

disclosed a possible infirmity in BONY's claim and lien position, that Faegre's representation of the Committee became adverse to BONY. Thus, at the time Faegre was retained there was only a potential conflict because of Faegre's representation of BONY in the unrelated American Housing matter. Therefore, Rule 1.7(b) rather than 1.7(a) is the applicable standard.

■ Under either Rule 1.7(a) or (b) consent of the client is necessary. However, consent may be oral or written. "As a general matter, a client may expressly or *impliedly* waive his objection and consent to an adverse representation." *Elonex*, 142 F.Supp.2d at 582 (emphasis added). *See also Kaiser Group*, 272 B.R. at 851.

Faegre asserts that any potential conflict was waived by BONY. BONY disputes that any potential conflict was waived by it. Its witnesses categorically denied giving any oral waiver. Further, it notes that its standard policy is to give only written waivers.[4]

The testimony is contradictory as to whether BONY orally waived the conflict: Pankow testified Siegel had no objection to Faegre's representation of the Committee in this case; Siegel denies ever having given an oral waiver. We find Pankow's testimony on this point more believable. Further, Pankow's testimony is more consistent with the actions taken by the parties: Pankow notified his partners shortly thereafter that a waiver of the conflict had be given while BONY took no action to object to Faegre's retention. BONY's lack of action is in direct contrast to its argument here. BONY asserts that Siegel never orally waived Faegre's conflict of interest, which BONY asserts was present the moment Faegre was retained as Committee counsel. If BONY believed that there was an actual conflict at that time and had not orally waived that conflict, it surely would have objected to the Faegre retention. Thus, we conclude that BONY did, in fact, orally waive any potential conflict at the time Faegre was retained as counsel to the Committee.

■ Even if BONY had not orally waived the conflict, we conclude that BONY did impliedly waive it. First, BONY impliedly waived any conflict by not objecting to Faegre's representation of the Committee when Faegre was initially retained in this case. BONY was aware of the Committee's retention of Faegre in late March or early April 2001 and was aware that Faegre also represented it at the time.[5] BONY also became aware that the Committee was investigating the validity of its claims and liens, yet did not object to Faegre's role. Certainly by the time the Committee asked BONY for an extension of the time to object to its claims (July, 2001), BONY was fully aware of Faegre's role and the possibility that the Committee may have an adverse interest to BONY. BONY still raised no objection.

Arguably, the conflict became actual when the Committee, represented by Faegre, commenced the adversary against BONY on October 15, 2001. However, at that time, Faegre believed that it no longer represented BONY in the American Housing case because it had been told by Pankow in May that the file was going with him to his new firm. (Apparently, no

---

4. BONY's policy was provided to Faegre as an attachment to its engagement letter. Pankow testified that he never saw it because it was attached to the end of BONY's billing procedures which he sent to Faegre's accounting department without reading.

5. Even if BONY were too large to be aware of all attorneys who were representing it, the application to retain Faegre in this case clearly revealed that Faegre was representing BONY in another, unrelated matter.

work was requested of Faegre in the American Housing case from May to October.) When the suit was filed against BONY on October 15, 2001, BONY knew that Faegre represented an adverse interest to it. However, instead of promptly objecting to Faegre's representation, BONY sought to have Faegre perform more work for it in the American Housing case in November 2001. The parties agreed that Faegre would perform the work requested by BONY in November without prejudice to the conflict issue. However, we are skeptical of the testimony of BONY regarding the circumstances surrounding its inquiry of Faegre. When told that Pankow—the only person who had worked on its file—had moved to another firm, it would have been natural for BONY to have wanted to talk to Pankow. Instead, BONY insisted that work be done by attorneys at Faegre who had never previously done work for it. We conclude that this was an attempt to create grounds to disqualify Faegre by getting it to perform current work. We can only conclude that the objectives of BONY were "a strategic ploy to undo the waiver that was given" by BONY. *Kaiser Group*, 272 B.R. at 852. Thus, we conclude that BONY waived any conflict by not objecting for almost one year to Faegre's representation of the Committee in this case. *Cf. Kaiser Group*, 272 B.R. at 852 (finding five months delay in filing motion to disqualify unreasonable).

■ Rule 1.7(b) would nonetheless mandate disqualification if Faegre's representation of the Committee would be materially limited by its representation of BONY in the American Housing case. We conclude that the representation of BONY in the American Housing case did not materially affect Faegre's ability to represent the Committee in this case. A single Faegre attorney had spent less than 25 hours over a nine-month period working on the American Housing matter. That attorney had gained no confidential BONY information as a result of the representation and served mostly to monitor the proceedings and give BONY advice. He was located in a different office from the Faegre attorneys working on this case and the two matters were unrelated. Further, Pankow left Faegre at the end of May 2001, and no else at Faegre represented BONY thereafter.

At most, Faegre's representation of the Committee may have been limited by its responsibilities to BONY, since at the time Faegre began representing the Committee, BONY was also its client, and it would have been improper for it to bring suit against BONY. However, as noted, at the time of Faegre's retention the interests of the Committee and BONY were not directly adverse. Had the Committee ultimately decided not to challenge BONY's liens, no actual conflict of interest would have arisen. As it took the Committee over four months to determine whether to challenge the liens, it cannot be said that a possible challenge to the liens and suit against BONY was anything more than speculative at the time Faegre began to represent the Committee. Furthermore, since the suit was ultimately brought by the Committee, there can be no suggestion that Faegre did not fulfill its fiduciary duty to the Committee by preventing it from suing another Faegre client.[6]

Faegre's subsequent termination of BONY as a client eliminated any conflict or impediment to Faegre's continued representation of the Committee. *See, e.g., Bank Brussels Lambert v. Coan (In re*

---

**6.** BONY's failure to object to Faegre may have been premised on its hope that Faegre would advise the Committee not to sue BONY.

*AroChem Corp.*), 176 F.3d 610, 623 (2d Cir.1999). Therefore, we conclude that Faegre's representation of the Committee was not materially limited by the representation of BONY and is not precluded under the Model Rules of Professional Conduct.

### B. *11 U.S.C. § 1103(b)*

BONY's argument that section 1103(b) of the Bankruptcy Code requires disqualification of Faegre is also unavailing. Section 1103(b) states that:

an attorney or accountant employed to represent a committee appointed under section 1102 of this title may not, while employed by such committee, represent any other entity having an adverse interest in connection with the case. Representation of one or more creditors of the same class as represented by the committee shall not per se constitute the representation of an adverse interest.

11 U.S.C. § 1103(b).

■ BONY relies on *In re National Liquidators, Inc.*, 182 B.R. 186, 192 (S.D.Ohio 1995) for the proposition that section 1103(b) "prohibits concurrent representation if such representation would interfere with counsel's vigorous advocacy for either client, jeopardize counsel's undivided loyalty to either client, or endanger the confidences and secrets of either client." Further, section 1103(b) "prohibits dual representation where there exists even the appearance of impropriety." *Id.* BONY argues that Faegre's concurrent representation of the Committee and BONY jeopardized Faegre's undivided loyalty to both clients and created an appearance of impropriety. However, the Third Circuit has held that disqualification of counsel *cannot* be premised on the appearance of conflict alone. *See In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 476 (3d Cir.1998). Thus, we decline to disqualify Faegre based on the mere appearance of impropriety.

BONY contends nonetheless that there was an adverse interest between the Committee and BONY, which is generally defined to mean "any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant." *National Liquidators*, 182 B.R. at 192, *quoting TWI Int'l v. Vanguard Oil & Serv. Co.*, 162 B.R. 672, 675 (S.D.N.Y.1994). However, the *National Liquidators* Court itself did not go as far as BONY argues. That Court held that it "simply exceeds rational bounds to rule that an adverse interest exists merely because ... a creditor's transactions with the debtor will be investigated, or because a remote, speculative, hypothetical possibility exists that, in the future, the ... Committee may dispute the creditor's claim or bring a cause of action against the creditor." *Id.*

■ In the instant case, at the time Faegre began to represent the Committee, there was nothing more than a speculative and hypothetical possibility that the Committee would sue BONY. By the time the Committee did file the adversary action against BONY, Faegre reasonably believed that it no longer represented BONY. The only attorney in the firm that had represented BONY had left the firm and had advised the firm that he was taking the BONY file with him. When Faegre discovered the file had not moved, and when it could not resolve the conflict with BONY, Faegre ceased representing BONY. Therefore, section 1103(b) does not mandate disqualification of Faegre. As the Second Circuit held in *AroChem:*

At the outset, we note that section 327(a) is phrased in the present tense, permitting representation by professionals "that do not hold or represent an

interest adverse to the estate," and limiting the class of acceptable counsel to those "that are disinterested persons." 11 U.S.C. § 327(a) (emphasis added). "Congress' use of a verb tense is significant in construing statutes." *United States v. Wilson*, 503 U.S. 329, 333, 112 S.Ct. 1351, 117 L.Ed.2d 593 (1992); see *Otte v. United States*, 419 U.S. 43, 49–50, 95 S.Ct. 247, 42 L.Ed.2d 212 (1974) (interpreting provision of Internal Revenue Code and according significance to Congress' use of both past and present tenses). Thus, counsel will be disqualified under section 327(a) only if it presently "holds or represents an interest adverse to the estate," notwithstanding any interests it may have held or represented in the past. Because Caddell has terminated its representation of Wells, it no longer represents Wells' interests and therefore survives the first half of the section 327(a) test.

176 F.3d at 623.

The language of section 1103(b) is no more stringent than section 327(a). Therefore, we conclude that, because Faegre was no longer representing BONY at the time the Motion to disqualify was filed, disqualification under section 1103(b) is not necessary.

We take seriously our duty to review the retention of counsel for the Committee in all cases to assure that there is no disqualifying impediment to their representation of the interests of creditors. In this case, our observation of the actions of Faegre throughout this case confirms that they have consistently and vigorously represented the interests of the Committee, often in the face of opposition by numerous parties. We are convinced that they have done a superb job of fulfilling their fiduciary duty here.

IV. *CONCLUSION*

For the foregoing reasons, the Motion filed by the Bank of New York, as indenture trustee, to Disqualify Faegre & Benson, LLP from serving as counsel to the Official Unsecured Creditor's Committee will be denied.